2008 VT 11

**State of Vermont v. Philip Morris USA Inc., R.J. Reynolds Tobacco Co., Lorillard Tobacco Co., Anderson Tobacco Co., The Chancellor Tobacco Co., et al.**

[945 A.2d 887]

No. 06-360

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 1, 2008

*William H. Sorrell*, Attorney General, and *Christy Taylor Mihaly* and *Julie S. Brill*, Assistant Attorneys General, Montpelier, for Plaintiff-Appellant.

*Karen McAndrew* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, *Thomas J. Frederick* and *Kevin J. Narko* of *Winston & Strawn LLP*, Chicago, Illinois, and *Alexander Shaknes, James Mathias* and *Brett Ingerman* of *DLA Piper US LLP*, New York, New York, for Defendant-Appellee Philip Morris USA Inc.

*Robert B. Hemley, Norman Williams* and *Matthew B. Byrne* of *Gravel and Shea*, Burlington, *Stephen R. Patton* of *Kirkland & Ellis LLP*, Chicago, Illinois, and *Marjorie Press Lindblom* and *Peter A. Bellacosa* of *Kirkland & Ellis LLP*, New York, New York, for Defendant-Appellee R.J. Reynolds Tobacco Company.

*Michael W. Wool* of *Langrock Sperry & Wool, LLP*, Burlington, and *Penny Packard Reid* of *Weil, Gotshal & Manges LLP*, New York, New York, for Defendant-Appellee Lorillard Tobacco Company.

*Gregory S. Mertz* of *Mertz, Talbott & Simonds*, Burlington, and *Robert J. Brookhiser* and *Elizabeth B. McCallum* of *Howrey LLP*, Washington, DC, for Defendants-Appellees Subsequent Participating Manufacturers.

¶ 1. **Burgess, J.** Plaintiff, the State of Vermont, appeals a judgment of the Chittenden Superior Court compelling arbitration and dismissing this declaratory judgment suit. The State sought a ruling concerning the amount of money to be paid to the State in accordance with the 1998 Master Settlement Agreement (MSA) entered into by the State, fifty-one other states and territories

(settling states), and the major domestic cigarette manufacturers. The superior court ruled that the dispute was subject to an arbitration clause in the MSA, and dismissed the case. We affirm.

¶ 2. In reviewing an order of dismissal, "we assume that all factual allegations pleaded by plaintiff, and reasonable inferences therefrom, are true, and that all contrary allegations are false." *Town of Brattleboro v. Garfield*, 2006 VT 56, ¶ 15, 180 Vt. 90, 904 A.2d 1157. Conclusions of law are reviewed de novo. *Bessette v. Dep't of Corrs.*, 2007 VT 42, ¶ 6, 182 Vt. 1, 928 A.2d 514.

¶ 3. The MSA was a settlement of state claims against tobacco manufacturers for recovery of health-care costs attributed to smoking-related illnesses. In exchange for the release of those claims, participating cigarette manufacturers (PMs)[1] agreed to, among other things, restrict their advertising and make annual payments to the settling states in perpetuity. Payments are disbursed from an escrow account to each settling state based on a set of formulas, calculations, and adjustments in § IX of the MSA. Master Settlement Agreement, http://naag.org/upload/1032468605_cigmsa.pdf. One such adjustment accounts for loss of PM market share to nonparticipating manufacturers (NPMs) as a result of the marketing limitations imposed on PMs by the MSA. Section IX(d) provides that when a market share loss has occurred, each state's allocated payment is reduced based on the percentage of the lost market share (NPM adjustment). However, a state is not subject to a reduced payment if the state "diligently enforced" a qualifying tobacco statute that requires NPMs to make escrow payments in lieu of settlement.[2] The reduction that would have otherwise been applied to a diligent-enforcement state is instead applied to further reduce payments, on a pro-rata basis, to the states that did not diligently enforce their qualifying statutes. Thus, a state that did not diligently enforce would benefit

---

[1] The PMs comprise two groups: those who were initial parties to the MSA, known as the "Original Participating Manufacturers" and those who joined the MSA later, known as the "Subsequent Participating Manufacturers." Differences between the two groups are irrelevant to this discussion.

[2] "A 'Qualifying Statute' means a Settling State's statute, regulation, law and/or rule . . . that effectively and fully neutralizes the cost disadvantages that the [PMs] experience vis-à-vis [NPMs] within such Settling State as a result of the provisions of [the MSA]." MSA § IX(d)(2)(E). Vermont's qualifying statute essentially mandates equalizing payments by NPMs to an escrow account for every unit of tobacco product sold. 33 V.S.A. § 1914(a)(2); see also § 1914(b) (discussing when these funds will be released from escrow).

from a determination that other states also did not diligently enforce so that the market share loss reduction would be spread among multiple states. On the other hand, if all states have diligently enforced their qualifying statutes, all states receive their full allocation and the PMs get no reduction to their annual payment.

¶ 4. The calculations for payment allocations are performed by an independent auditor. Section XI provides that the auditor:

> shall calculate and determine the amount of all payments owed pursuant to [the MSA], the adjustments, reductions and offsets thereto (and all resulting carryforwards, if any), the allocation of such payments, adjustments, reductions, offsets and carry-forwards among the Participating Manufacturers and among the Settling States, and shall perform all other calculations in connection with the foregoing. . . . The Independent Auditor shall promptly collect all information necessary to make such calculations and determinations.

¶ 5. Section VII(a) acknowledges that state courts have general jurisdiction to implement and enforce the parties' agreement: "Each [PM] and each Settling State acknowledge that the Court . . . shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State." Section XI(c), however, states that:

> Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor . . . shall be submitted to binding arbitration before a panel of three neutral arbitrators . . . . The arbitration shall be governed by the United States Federal Arbitration Act.

Section XI(c) thus carves out of § VII(a)'s general jurisdiction all disputes "arising out of or relating to calculations performed by" the auditor, specifically stating that these disputes "shall be submitted to binding arbitration before a panel of three neutral arbitrators." *State v. Philip Morris, Inc.*, 905 A.2d 42, 49 (Conn. 2006); see *People v. Lorillard Tobacco Co.*, 865 N.E.2d 546, 552 (Ill. App. Ct. 2007). The disputes subject to arbitration include "any dispute concerning the operation or application of any of the

adjustments, reductions, offsets, carry-forwards and allocations." MSA § XI(c).

¶ 6. In 2006, the auditor determined that the PMs experienced a market share loss for the year 2003. Pursuant to § IX, a separate consulting firm concluded that the market share loss was a result of the MSA. Accordingly, the PMs requested that their payments be reduced. The settling states responded by asking that the auditor continue its past practice of presuming diligent enforcement for states that had enacted qualifying statutes. The auditor granted the states' request and continued to presume diligent enforcement for 2003. Several of the PMs, believing the auditor's presumption to be in error, made their 2006 payments into the MSA's escrow account for disputed payments. The State of Vermont and thirty-six other states then filed suits in courts in their own jurisdictions for declaratory judgments that they had diligently enforced their qualifying NPM escrow-payment laws in 2003.

¶ 7. The trial court found the language of the MSA to be "very clear" with regard to arbitration of payment disputes. The auditor is required to calculate all payments owed to the settling states. Any NPM adjustment is included in those calculations. Therefore, the court reasoned, any dispute about application of an NPM adjustment is covered by § XI(c)'s arbitration clause. The court noted that, at the time of its decision, courts in six other states had addressed the same issue and all had ruled in favor of arbitration. Having concluded that the issue must go to arbitration, the court dismissed the case. The State appealed.

## I. Jurisdiction

¶ 8. Before reaching the merits of the trial court's decision, we must consider the PMs' motion to dismiss this appeal. The PMs argue that the Vermont Arbitration Act (VAA), 12 V.S.A. §§ 5651-5681, does not permit appeal of an order compelling arbitration.

¶ 9. The question before the trial court, and now this Court on appeal, is one of contract interpretation: whether the parties contractually assigned disputes over determinations of diligent enforcement to arbitration via § XI(c) of the MSA. State courts have general jurisdiction to consider questions of contract; this jurisdiction is limited only when the Legislature has specifi-

cally divested the courts of jurisdiction over particular claims through statute. Ordinarily, this Court is empowered to review, and litigants are entitled to appeal from, any final order of the superior court. 4 V.S.A. § 2.

¶ 10. The PMs argue that the VAA precludes jurisdiction in this Court to entertain an appeal by the State from the trial court's order granting the PMs' motion to compel arbitration in accordance with the MSA. See 12 V.S.A. § 5681(a)(1) (allowing an appeal from an order *denying*, rather than granting, a motion to compel arbitration). The VAA, however, is inapplicable in this case. The MSA expressly provides, in § XI(c), that arbitration between the parties shall be governed by the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-14.

¶ 11. Whether and how a particular issue between the parties is subject to arbitration is a matter of contract. Parties "are generally free to structure their arbitration agreements as they see fit. . . . [T]hey may limit by contract the issues which they will arbitrate, . . . [as well as the] rules under which that arbitration will be conducted." *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 479 (1989) (citation omitted). Courts must give effect to these arbitration provisions. See 9 U.S.C. § 2 ("A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable . . . ."); 12 V.S.A. § 5652(a) ("[A] provision in a written contract to submit to arbitration any controversy thereafter arising between the parties creates a duty to arbitrate, and is valid, enforceable and irrevocable . . . ."); see also *Volt*, 489 U.S. at 478 (explaining that the FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms"). Here, the PMs and the State specifically contracted to arbitrate disputes "arising out of or relating to calculations performed by . . . the Independent Auditor . . . [under] the United States Federal Arbitration Act." MSA § XI(c).

¶ 12. This provision makes clear the parties' intention to arbitrate under the FAA rather than the VAA, and we must give effect to this choice. See *Mayo v. Dean Witter Reynolds, Inc.*, 258 F. Supp. 2d 1097, 1114 (N.D. Cal. 2003) ("Under the FAA, [the parties] ha[ve] a right to enforce the arbitration agreement

according to its terms."). Given our broad implementation and enforcement jurisdiction under § VII(a) of the MSA, we find no authority in the FAA to divest this Court from hearing an appeal from the trial court's order interpreting the contract provision. See *Philip Morris*, 905 A.2d at 49. Accordingly, this Court has jurisdiction to hear the State's appeal.

## II. Arbitration

¶ 13. In deciding whether parties agreed to arbitrate a matter, we apply the ordinary rules of contract interpretation. *Bellows Falls Union High Sch. Dist. No. 27 v. Rodia*, 139 Vt. 262, 264, 428 A.2d 1094, 1095 (1981). "[W]e interpret contracts to give effect to the parties' intent, which we presume is reflected in the contract's language when that language is clear." *In re Adelphia Bus. Solutions of Vt., Inc.*, 2004 VT 82, ¶ 7, 177 Vt. 136, 861 A.2d 1078. We also strive to "give effect to every part of the instrument and form a harmonious whole from the parts." *In re Verderber*, 173 Vt. 612, 615, 795 A.2d 1157, 1161 (2002) (mem.).

¶ 14. We begin our analysis with MSA § VII's jurisdiction provision. That section provides that a designated court in each settling state — Chittenden Superior Court in Vermont — retains "exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State" and "shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to such Settling State." The State acknowledges that there are several exceptions to § VII's general rule of jurisdiction, including special arbitration for disputes over attorney's fees for the settled lawsuits, MSA § XVII(d), and, as described above, § XI(c) arbitration for disputes over determinations by the auditor. The State contends, however, that no exception, including § XI(c), applies because the determination regarding diligent enforcement is not expressly assigned to the auditor.

¶ 15. Applying an NPM adjustment is a three-step process. First, the auditor determines that a market share loss has occurred. Second, the consulting firm determines that the MSA was a significant factor in the market share loss. Finally, when both those determinations have been made, someone must determine whether each of the settling states should nevertheless retain a full allocation of payment based on diligent enforcement of a qualifying statute. The State argues that because the MSA

does not designate any particular decisionmaker to evaluate the State's diligence in enforcing its qualifying statute, § VII's general jurisdiction provision should control.

¶ 16. The PMs contend, and the trial court agreed, that the task of determining diligent enforcement falls to the auditor, at least by default. The auditor must calculate all payments owed to the settling states. MSA § XI(a). The MSA provides specific steps that the auditor must follow in making its calculations, including the order in which adjustments are made. MSA § IX(j). Applying the NPM adjustment is the sixth step in the thirteen-step process of calculating payments due. *Id.* Thus, the auditor cannot calculate payments due in conformity with the MSA without deciding whether the NPM adjustment applies, and it can make that decision only after first deciding whether each state performed diligent enforcement. As the events leading up to this case demonstrate, the auditor must somehow decide whether to apply the NPM adjustment, even if that means simply making a presumption of diligent enforcement in certain circumstances, as was done for 2003. The State's argument — that the auditor is an unlikely or even ill-equipped party to be making an initial determination of diligent enforcement — does not change the fact that diligent enforcement is a condition precedent to payment. See *State v. Philip Morris USA, Inc.*, 927 A.2d 503, 510 (N.H. 2007) (rejecting state's argument that auditor lacked authority to make determination of diligent enforcement when MSA § XI(a) requires auditor to determine amount PMs owe, including adjustments).

 ¶ 17. Furthermore, the arbitration clause applies not just to determinations by the auditor but also to disputes "arising out of or relating to" those determinations. MSA § XI(c). This language broadens the arbitration clause's application to "*any* matter arising out of, or relating to, the subject matter" of the auditor's calculations and determinations. *State v. Philip Morris, Inc.*, 813 N.Y.S.2d 71, 75 (App. Div. 2006). The phrase "related to" is broad, ordinarily encompassing matters "connected to," "associated with" and "brought with reference to" that which is subject to arbitration. *Vt. Pure Holdings, Ltd. v. Descartes Sys. Group, Inc.*, 140 F. Supp. 2d 331, 335 (D. Vt. 2001) (quotations omitted). The question of diligent enforcement is, at the least, "related to" the auditor's calculations and determinations. As described above, the MSA makes no provision for someone other than the auditor to determine diligent enforcement, and the task therefore falls to the

auditor by virtue of its responsibility to apply adjustments in calculating payments. Because diligent enforcement is a required component of the auditor's payment calculations, it arises out of or relates to the auditor's calculations and determinations, and is therefore subject to arbitration.[3]

¶ 18. According to the State, interpreting the MSA as providing for the auditor — an accounting firm — to determine diligent enforcement would be "inappropriate," if not "nonsensical," and therefore contrary to what the parties must have intended.[4] See *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002) ("Nonsensical interpretations of contracts . . . are disfavored. . . . [n]ot because of a judicial aversion to nonsense as such, but because people are unlikely to make contracts . . . that they believe will have absurd consequences."). In *FutureSource*, the court rejected a contract interpretation that would have entitled the plaintiff to "a lifetime of free data service" worth millions of dollars. *Id.* at 285. The result alleged by the State in this case is significantly less absurd, if at all. The qualifying statute for which the auditor must make a determination of diligent enforcement is purely financial, requiring NPMs to make payments into an escrow account for each unit of tobacco sold. 33 V.S.A. § 1914. Presumably, the auditor could determine diligent enforcement by comparing the units of tobacco sold and

---

[3] Section XI(c) goes on to parenthetically state that disputes subject to arbitration include, "without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j)." The State argues that this parenthetical phrase should not supersede the main clause's provision that it applies to any dispute "arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor." The State's point is that the auditor did not make a calculation or determination of diligent enforcement, only a presumption. On this point we agree with the thorough opinion of the Connecticut Superior Court addressing this issue: the broader main clause "delimits the substantive scope of the right to arbitrate under MSA § XI(c), while the narrower, parenthetical phrase that immediately follows it . . . describes a subset of disputes that clearly fall within that scope and usefully illustrate the full range of disputes, controversies or claims that are made arbitrable thereunder." *State v. Philip Morris, Inc.*, No. X02CV960148414S, 2005 WL 2081763, at *35 (Conn. Super. Ct. Aug. 3, 2005). Even accepting the State's position and not considering the parenthetical, the main clause is sufficiently broad to include the present issue.

[4] Curiously, while the State now believes that having the auditor determine diligent enforcement would be "inappropriate" and "nonsensical," the State previously asked the auditor to presume diligent enforcement. See *supra*, ¶ 6.

the amount of money deposited into the account.[5] That the auditor would be asked to perform this function is not so unreasonable that the parties could not have intended it.

¶ 19. Finally, the State maintains that submitting each settling state's dispute over diligent enforcement to one "nation-wide arbitration" is unworkable in addressing the individual facts of each state's case. Other courts addressing this issue, however, have found "compelling logic" in having disputes over diligent enforcement handled by one arbitration panel rather than separate courts in each settling state. *Philip Morris Inc.*, 813 N.Y.S.2d at 76. The New York court reasoned:

> Since the granting of an exemption by one settling state will automatically lead to the reallocation of its allocated portion of the NPM adjustment to all other non-exempt settling states, each governmental signatory has its own self-interest at stake in the outcome of this issue, which is necessarily in conflict with every other state. Such a result defeats the whole purpose of having a Master Settlement Agreement. The mechanism of submitting disputes involving the decisions of the Independent Auditor to a neutral panel of competent arbitrators, who are guided by one clearly articulated set of rules that apply universally in a process where all parties can fully and effectively participate, obviates this problem and ensures fairness for all parties to the MSA. To hold otherwise is contrary to both the spirit and the plain language of the Master Settlement Agreement.

*Id.* We agree. Even if the State's fear that a single arbitration panel will be unable to adequately address the specifics of each state's case proves to be true, that fear is not a basis for denying arbitration here. How the arbitrators pursue their determination of diligent enforcement is a separate issue from whether arbitration is required by the MSA. Such problems, if they do materi-

---

[5] The State tobacco stamp tax is assessed through the sale of stamps to licensed wholesale and retail dealers, who must affix a stamp to each package of cigarettes sold to evidence payment. 32 V.S.A. § 7772. It appears the auditor could determine the number of units of tobacco sold by tallying the stamps sold by the State in a given year. *Id.* ("The commissioner shall keep accurate records of all stamps sold to each wholesale dealer and retail dealer . . . .").

alize, may be raised in a post-arbitration motion to vacate or modify the award pursuant to § 16(a)(3) of the FAA.

*The order compelling arbitration and dismissing the suit is affirmed.*