STATE OF NORTH CAROLINA, PLAINTIFF v. PHILIP MORRIS USA, INC.; R.J. REYNOLDS TOBACCO COMPANY; BROWN & WILLIAMSON TOBACCO COMPANY, INDIVIDUALLY AND AS SUCCESSOR BY MERGER TO THE AMERICAN TOBACCO COMPANY; AND LORILLARD TOBACCO COMPANY, DEFENDANTS

No. COA07-409

(Filed 7 October 2008)

**1. Appeal and Error— appealability—order compelling arbitration—writ of certiorari**

The Court of Appeals exercised its discretion under N.C. R. App. P. 21 to grant the State's petition for writ of certiorari to review the merits of an appeal from an order compelling arbitration.

**2. Arbitration and Mediation— Master Settlement Agreement—sovereign immunity**

The Business Court did not err in a declaratory judgment action arising out of the Master Settlement Agreement entered into by most of the states and various tobacco manufacturers to resolve tobacco-related litigation by ordering arbitration even though the State contends the order was barred by sovereign immunity because: (1) contrary to defendants' assertion, N.C.G.S. § 105-113.4C does not preclude an order compelling arbitration to determine whether North Carolina diligently enforced its escrow statute; (2) the State failed to demonstrate

**STATE v. PHILIP MORRIS USA, INC.**

[193 N.C. App. 1 (2008)]

that an order compelling arbitration was barred by sovereign immunity; and (3) the order does not violate the separation of powers doctrine.

**3. Arbitration and Mediation— Master Settlement Agreement—diligent enforcement of state escrow statute**

The Business Court properly concluded in a declaratory judgment action that the parties knowingly and intentionally agreed to arbitrate the dispute including diligent enforcement of North Carolina's escrow statute regarding the Master Settlement Agreement (MSA) entered into by most of the states and various tobacco manufacturers to resolve tobacco-related litigation because: (1) the plain language of the MSA established that the issue of application of the nonparticipating manufacturers (NPM) adjustment for 2003, including the question of diligent enforcement, must be arbitrated; (2) all of the other jurisdictions considering this issue concluded that the MSA subjected the issue of diligent enforcement to arbitration; and (3) the underlying dispute over the independent auditor's decision not to apply the NPM adjustment falls within the scope of the arbitration provision since it directly involves a determination concerning the operation or application by the independent auditor, and the dispute also arises out of or relates to the independent auditor's calculation of the annual payments.

**4. Arbitration and Mediation— Tobacco Settlement Agreements—lack of diligent enforcement**

Although the State contends in a declaratory judgment action that the participating tobacco manufacturers (PM) released any claims they possess regarding a lack of diligent enforcement in 2003, the dispute over whether the June 2003 Tobacco Settlement Agreements prohibited the PM from contesting diligent enforcement in 2003 fell within the purview of the auditor's determination concerning the applicability of the NPM adjustment, and therefore, must be presented as part of the arbitration process.

Appeal by plaintiff from order entered 4 December 2006 by Judge Ben F. Tennille in Wake County Superior Court. Heard in the Court of Appeals 13 November 2007.

*Attorney General Roy Cooper, by Special Deputy Attorneys General Buren R. Shields, III and Melissa L. Trippe, for plaintiff-appellant.*

STATE v. PHILIP MORRIS USA, INC.

[193 N.C. App. 1 (2008)]

*Manning, Fulton & Skinner, P.A., by Michael T. Medford, and Winston & Strawn, LLP, by Thomas J. Frederick, for defendant-appellee Philip Morris USA, Inc.*

*Womble Carlyle Sandridge & Rice, PLLC, by Burley B. Mitchell, Jr. and W. David Edwards, and Kirkland & Ellis LLP, by Stephen R. Patton and Douglas G. Smith, for defendant-appellee R.J. Reynolds Tobacco Company.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jim W. Phillips, Jr., and Weil, Gotshal & Manges LLP, by Penny Reid, for defendant-appellee Lorillard Tobacco Company.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Clifton L. Brinson, and Howrey, LLP, by Robert J. Brookhiser and Elizabeth B. McCallum, for defendants-appellees Subsequent Participating Manufacturers.*

GEER, Judge.

This appeal arises out of the Master Settlement Agreement ("MSA") entered into by most of the states and various tobacco manufacturers to resolve tobacco-related litigation. The State appeals from the Business Court's order compelling arbitration, arguing that the order is barred by sovereign immunity, interferes with prosecutorial discretion, and is inconsistent with the MSA. Forty-seven other jurisdictions have already addressed identical litigation brought by other governments and unanimously have concluded that the issues must be arbitrated.[1] While those opinions are not binding on us, we are in agreement with the reasoning in those decisions and see no

---

1. The decision by the Maryland Court of Special Appeals in *State v. Philip Morris Inc.*, 179 Md. App. 140, 155 n.10, 944 A.2d 1167, 1173 n.10, *cert. denied*, 405 Md. 65, 949 A.2d 653 (2008), lists decisions from 46 jurisdictions (44 states, the District of Columbia, and Puerto Rico) that have also addressed the issues before this Court regarding the MSA. The Maryland decision indicates that 45 of the 46 jurisdictions determined that the dispute is subject to arbitration, with a Louisiana trial court rendering the sole contrary decision. Since the filing of the Maryland opinion, the Louisiana Court of Appeals has reversed the trial court and held that the plain language of the MSA requires arbitration. *See State v. Philip Morris USA, Inc.*, 980 So. 2d 296 (La. Ct. App. 2008). In addition, a Georgia Superior Court has also concluded that the dispute is subject to arbitration. *See State v. Philip Morris USA, Inc.*, No. 2006CV6128 (Ga. Super. Ct. Feb. 4, 2008). In addition to Louisiana and Maryland, the following appellate courts have rendered decisions: *State v. Lorillard Tobacco Co.*, 2008 Ala. LEXIS 62, 2008 WL 821054 (Mar. 28, 2008); *State v. The Honorable Timothy J. Ryan*, No. 1 CA-SA 07-0083 (Ariz. Ct. App. May 24, 2007); *State v. Philip Morris, Inc.*, 279 Conn. 785, 905 A.2d 42 (2006); *People v. Lorillard Tobacco Co.*, 372 Ill. App. 3d 190, 865

basis for distinguishing the North Carolina litigation. We, therefore, affirm the Business Court's order compelling arbitration.

Facts

After decades of litigation between private consumers and cigarette manufacturers, the attorneys general in all 50 states initiated public causes of action against tobacco manufacturers. In 1998, 46 states (including North Carolina), the District of Columbia, Puerto Rico, and five U.S. Territories (collectively "the settling states") entered into the MSA with Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company, the original participating manufacturers (the "OPMs"). Since the execution of the agreement, more than 40 other manufacturers (identified as subsequent participating manufacturers or "SPMs") have joined the agreement. Together, the OPMs and SPMs are referred to as participating manufacturers (or "PMs").

Under the MSA, the PMs agreed to make annual payments to the settling states as compensation for smoking-related medical costs. The MSA requires the PMs, on 15 April of every year, to each make a single payment into an escrow account in an amount calculated annually by an independent auditor based on a formula set out in the MSA. The auditor allocates the annual settlement payment among the settling states in accordance with the MSA. The annual national payment is, however, subject to several adjustments, including the one at issue in this case: the non-participating manufacturers (the "NPMs") adjustment.

The NPM adjustment reduces the PMs' annual payment obligations as compensation for their losing market share to tobacco companies not subject to the MSA. In order to receive the adjustment, (1)

N.E.2d 546, *appeal denied*, 225 Ill. 2d 657, 875 N.E.2d 1119 (2007); *State v. Philip Morris Tobacco Co.*, —— Ind. App. ——, 879 N.E.2d 1212 (2008); *Commonwealth v. Philip Morris Inc.*, 448 Mass. 836, 864 N.E.2d 505 (2007); *Attorney General v. Philip Morris USA*, 2007 Mich. App. LEXIS 1490, 2007 WL 1651839, *appeal denied*, 480 Mich. 990, 742 N.W.2d 118 (2007); *State v. R.J. Reynolds Tobacco Co.*, 275 Neb. 310, 746 N.W.2d 672 (2008); *State v. Philip Morris USA, Inc.*, 155 N.H. 598, 927 A.2d 503 (2007); *State v. Philip Morris Inc.*, 8 N.Y.3d 574, 869 N.E.2d 636 (2007); *State v. Philip Morris, Inc.*, 2007 ND 90, 732 N.W.2d 720 (2007); *State v. Philip Morris USA Inc.*, 2008 VT 11, 945 A.2d 887 (2008); *Commonwealth v. Philip Morris USA, Inc.*, No. 062245 (Va. Feb. 21, 2007). At present, trial and appellate courts in 45 states, the District of Columbia, and Puerto Rico have addressed the issues before this Court. No jurisdiction has found the arguments made by the State in this case to be persuasive.

STATE v. PHILIP MORRIS USA, INC.

[193 N.C. App. 1 (2008)]

the PM must have experienced a "Market Share Loss,"[2] and (2) an economic consulting firm must determine "that the disadvantages experienced as a result of the provisions of [the MSA] were a significant factor contributing to the Market Share Loss." (Internal quotation marks omitted.) If a PM meets these two requirements, then the PM may be entitled to reduce its payment for that year.

A state may avoid its share of the NPM adjustment by demonstrating that, during the year at issue, it "diligently enforced" a "Qualifying Statute," defined as a statute as set out in the MSA that imposes an escrow obligation on NPMs that is roughly equivalent to the payments the NPMs would pay if they had signed the MSA ("the escrow statute"). If a state makes the required showing, its share of the adjustment is reallocated to other settling states that did not diligently enforce a qualifying statute.

In early 2004, the independent auditor requested information from the National Association of Attorneys General ("NAAG") regarding qualifying statutes in the settling states. The NAAG informed the auditor that all of the settling states had enacted model statutes that they represented to have been in full force and effect. Based on this information, the auditor concluded that "no possible NPM adjustment is allocated to PMs." As the Business Court explained, the independent auditor, "having found that each Settling State had a Qualifying Statute in force, effectively presumed that each Settling State had diligently enforced that statute as required" by the MSA.

The current dispute involves the annual payment that was due on 17 April 2006. Pursuant to the NPM adjustment provisions, the economic consulting firm concluded that the MSA was a significant factor contributing to the PMs' 2003 market share loss. The OPMs, therefore, requested that the independent auditor apply the NPM adjustment to the payments due on 17 April 2006. The auditor, however, indicated that it "would not modify its current approach to the application of the NPM Settlement Adjustment" and would continue to presume that the statutes had been diligently enforced.

The OPMs formally objected to the independent auditor's final calculation on 10 April 2006 and requested that North Carolina and the other settling states arbitrate the dispute over the NPM adjustment. North Carolina refused to enter into arbitration, as did the other settling states. On 20 April 2006, the State filed a Motion for

---

2. A market share loss occurs if the PM's share of the U.S. cigarette market declines from one year to the next.

Declaratory Order requesting that the Business Court (1) construe the MSA term "diligent enforcement," (2) find and declare that North Carolina had diligently enforced its qualifying statute, (3) find that North Carolina is not subject to an NPM adjustment for 2003, and (4) require the OPMs and SPMs to make the escrow payment into a disputed payments account or seek an offset of any payments made. On 15 May 2006, the OPMs filed a "Motion to Compel Arbitration and to Dismiss or, in the Alternative, Stay This Litigation." The SPMs moved to intervene on 6 June 2006, and the Business Court granted the motion to intervene over the State's objection on 25 July 2006.

On 4 December 2006, the Business Court granted the PMs' motion to compel arbitration, directed that the parties submit their dispute to the arbitration panel as provided in the MSA, and stayed further litigation pending arbitration. The State appealed to this Court.

## Discussion

[1] As an initial matter, we note that this appeal is from an order compelling arbitration. Generally, our courts have held that such orders are not immediately appealable. *See, e.g., Laws v. Horizon Hous., Inc.*, 137 N.C. App. 770, 771, 529 S.E.2d 695, 696 (2000) (holding that no immediate right of appeal exists from an order compelling arbitration); *Bluffs, Inc. v. Wysocki*, 68 N.C. App. 284, 286, 314 S.E.2d 291, 293 (1984) (holding "there is no right of appeal from an order compelling arbitration").

The State does not argue otherwise, but contends that appellate jurisdiction exists because the order compelling arbitration denied its claim of sovereign immunity and, therefore, affects a substantial right under N.C. Gen. Stat. §§ 1-277(a) and 7A-27(d) (2007). *See Moore v. N.C. Coop. Extension Serv.*, 146 N.C. App. 89, 92, 552 S.E.2d 662, 664, *appeal dismissed and disc. review denied*, 354 N.C. 574, 559 S.E.2d 180 (2001); *RPR & Assocs. v. State*, 139 N.C. App. 525, 527, 534 S.E.2d 247, 250 (2000) ("[T]he denial of a motion to dismiss based upon the defense of sovereign immunity affects a substantial right and is thus immediately appealable."), *aff'd per curiam*, 353 N.C. 362, 543 S.E.2d 480 (2001). As discussed in further detail below, we disagree with the State's contention that the Business Court's ruling implicates the State's sovereign immunity. The State has, however, also filed a petition for writ of certiorari. We exercise our discretion under N.C.R. App. P. 21 to grant the petition and review the merits of this appeal.

STATE v. PHILIP MORRIS USA, INC.

[193 N.C. App. 1 (2008)]

I

**[2]** We first address the State's contention that sovereign immunity bars any order compelling the State to arbitrate the question whether North Carolina "diligently enforced" its escrow statute. Sovereign immunity is a common law doctrine that prohibits a lawsuit *against* the State of North Carolina "unless it consents to be sued or upon its waiver of immunity." *Guthrie v. N.C. State Ports Auth.*, 307 N.C. 522, 534, 299 S.E.2d 618, 625 (1983). Under this doctrine, " '[i]t is for the General Assembly to determine when and under what circumstances the State may be sued.' " *Id.* (emphasis omitted) (quoting *Great Am. Ins. Co. v. Gold*, 254 N.C. 168, 173, 118 S.E.2d 792, 795 (1961), *overruled on other grounds by Smith v. State*, 289 N.C. 303, 222 S.E.2d 412 (1976)).

In this case, however, the State was not sued, but rather brought suit against the OPMs. It then chose to settle the litigation pursuant to the MSA, which included among its terms an arbitration provision. The State does not appear to be arguing that no authority to enter into the MSA existed. Indeed, such an argument could result in forfeiture of hundreds of millions of dollars.

Nor can the State be asserting that it can never be bound to arbitrate. Courts, including our Supreme Court, have enforced arbitration agreements against sovereigns. *See Johnston County v. R. N. Rouse & Co.*, 331 N.C. 88, 97, 414 S.E.2d 30, 35 (1992) (holding that county should be compelled to arbitrate based on contract including arbitration clause); *see also C&L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 423, 149 L. Ed. 2d 623, 634, 121 S. Ct. 1589, 1597 (2001) (holding that tribe "consented to arbitration" in agreement it signed and "thereby waived its sovereign immunity"); *Hardie v. United States*, 367 F.3d 1288, 1291 (Fed. Cir. 2004) (rejecting federal government's claim that it did not waive its sovereign immunity as to binding arbitration and holding "the United States is subject to the arbitration clause of the joint venture agreement just as any private party would be").

The State initially asserts that prosecutorial discretion is encompassed within sovereign immunity and "is protected irrespective of whether it is the subject of a provision in a State contract." According to the State, prosecutorial discretion "is subject, if [at] all, to only the most limited *judicial* review; and is never subject to the substitution of judgment or *de novo* determination by arbitration." As support for this broad assertion, the State relies solely upon *Heckler v. Chaney*,

470 U.S. 821, 84 L. Ed. 2d 714, 105 S. Ct. 1649 (1985). Nothing in *Heckler* validates the State's proposition.

*Heckler* addressed whether individuals sentenced to death by lethal injection could seek review under the federal Administrative Procedure Act (the "APA") of the FDA's failure to take investigatory and enforcement actions to prevent states from using lethal injection drugs when the FDA had not approved their use for human executions. *Id.* at 823-24, 84 L. Ed. 2d at 718-19, 105 S. Ct. at 1651-52. As the opinion states, the case "turn[ed] on the important question of the extent to which determinations by the FDA *not to exercise* its enforcement authority over the use of drugs in interstate commerce may be judicially reviewed. That decision in turn involves the construction of two separate but necessarily interrelated statutes, the APA and the [Federal Food, Drug, and Cosmetic Act]." *Id.* at 828, 84 L. Ed. 2d at 721, 105 S. Ct. at 1654. Ultimately, the Court concluded that, under the APA, an enforcement decision is "presumptively unreviewable," but that "presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832-33, 84 L. Ed. 2d at 724, 105 S. Ct. at 1656. The Court stressed, however, that "Congress may limit an agency's exercise of enforcement power if it wishes . . . ." *Id.* at 833, 84 L. Ed. 2d at 725, 105 S. Ct. at 1656.

The obvious distinction is that this case does not involve the federal APA. Regardless, *Heckler* does not address a government's ability to enter into a contract providing for arbitration and does not discuss principles of sovereign immunity. The State's assertion, citing *Heckler*, that any review of an enforcement decision is limited to (1) a North Carolina court, (2) determining compliance with legislatively promulgated standards, (3) with application of an abuse of discretion standard is not supported by *Heckler*. Nor does *Heckler* in any way suggest, as the State claims it does, that "[a]ny further or different review/assessment is barred by sovereign immunity."[3]

In any event, requiring arbitration of the question whether a state has diligently enforced its escrow statute does not interfere with the

3. For this latter proposition, the State also cites *Central Carolina Nissan, Inc. v. Sturgis*, 98 N.C. App. 253, 261, 390 S.E.2d 730, 735, *disc. review denied*, 327 N.C. 137, 394 S.E.2d 169 (1990). In that case, this Court held only that the trial court properly imposed Rule 11 sanctions on an attorney for filing a declaratory judgment action, in the midst of settlement negotiations with the State, seeking a declaration that its anticipated defenses to any action to be later filed by the State were meritorious.

STATE v. PHILIP MORRIS USA, INC.

[193 N.C. App. 1 (2008)]

State's prosecutorial discretion. The State may prosecute or not, as it chooses. The State does not dispute that, under the MSA, if it has chosen not to prosecute, then it is subject to the NPM adjustment and is subject to litigation regarding issues relating to the adjustment. Indeed, the State clarified in its reply brief: "The State asserts the immunity of its sovereign prosecutorial discretion only as to this latter, legal determination [of whether the State in fact diligently enforced its escrow statute]. The State does not challenge the PMs' entitlement to an NPM Adjustment." In short, the State asserts that "sovereign immunity bars both the forum (national arbitration) and the standard of review (whatever the arbitrators select) that the OPMs assert." The State does not explain, however, in what manner the choice of forum and the standard of review regarding whether it has diligently enforced the statute implicates its discretion to decide whether to enforce the statute in the first place.

The Massachusetts Supreme Judicial Court has, in considering this exact argument, concluded that it "misses the mark." *Commonwealth v. Philip Morris Inc.*, 448 Mass. 836, 848, 864 N.E.2d 505, 514 (2007). The court explained:

> Submitting the diligent enforcement question to an arbitrator cedes neither sovereign power nor the task of reviewing discretionary enforcement decisions under [the escrow statute]. Any determination by the auditor or the arbitrator concerning diligent enforcement has meaning only in the context of the settlement agreement, with no effect on anyone except for the settlement agreement parties. It is an analysis to determine whether a condition in the contract has been met. There is no reason why the Commonwealth, as opposed to any other party to a contract, cannot be subject to an analysis of its having met (or not) contractual conditions within the terms established by the contract. Determining whether the Commonwealth has met a condition in a contract does not constitute a cession or delegation of the sovereign enforcement power. Indeed, the settlement agreement places no limitations on the Commonwealth's prerogative to enforce [the escrow statute] as it sees fit. Nor, as the Commonwealth suggests, does it subject the Commonwealth's enforcement decisions to discretionary review of the sort that takes place in a court. Judicial review tests the basis and legality of government action, and can result in a court's vacating a rule or an enforcement decision. . . . In contrast, the settlement agreement's diligent enforcement determination does nothing to compel, mod-

ify, or vacate any action the Commonwealth may take pursuant to [the escrow statute].

*Id.* at 848-49, 864 N.E.2d at 514-15 (internal quotation marks omitted). *See also State v. Philip Morris USA, Inc.*, 927 A.2d 503, 513 (N.H. 2007) (holding that, under the MSA, even if compelled to arbitrate, the State retains full enforcement power and sovereign immunity is not implicated).

The State contends that N.C. Gen. Stat. § 105-113.4C (2007) differentiates this State from the other jurisdictions. The statute provides:

The Master Settlement Agreement between the states and the tobacco product manufacturers, incorporated by reference into the consent decree referred to in S.L. 1999-2, requires each state to diligently enforce Article 37 of Chapter 66 of the General Statutes. The Office of the Attorney General and the Secretary of Revenue shall perform the following responsibilities in enforcing Article 37:

(1) The Office of the Attorney General must give to the Secretary of Revenue a list of the nonparticipating manufacturers under the Master Settlement Agreement and the brand names of the products of the nonparticipating manufacturers.

(2) The Office of the Attorney General must update the list provided under subdivision (1) of this section when a nonparticipating manufacturer becomes a participating manufacturer, another nonparticipating manufacturer is identified, or more brands or products of nonparticipating manufacturers are identified.

(3) The Secretary of Revenue must require the taxpayers of the tobacco excise tax to identify the amount of tobacco products of nonparticipating manufacturers sold by the taxpayers, and may impose this requirement as provided in G.S. 66-290(10).

(4) The Secretary of Revenue must determine the amount of State tobacco excise taxes attributable to the products of nonparticipating manufacturers, based on the information provided by the taxpayers, and must report this information to the Office of the Attorney General.

N.C. Gen. Stat. § 105-113.4C. According to the State, this statute constitutes a "promulgation of reviewable standards" from which "it is clear that the General Assembly intended to supply a definition for 'diligently enforced' in North Carolina by applying the common law of prosecutorial discretion."

The plain language of the statute—contained in the Chapter of the General Statutes relating to Taxation and not the section specifically addressing Tobacco Escrow Compliance, N.C. Gen. Stat. § 66-292 *et seq.* (2007)—indicates that the General Assembly was only setting out an allocation of responsibilities as between the Secretary of Revenue and the Office of the Attorney General in connection with diligent enforcement of the escrow statute. N.C. Gen. Stat. § 105-113.4C imposes certain duties on the Office of the Attorney General for compiling lists. Contrary to the State's assertion, the statute does not include any standards applicable to the decision of the Attorney General regarding whether to enforce the escrow statute under N.C. Gen. Stat. § 66-291(c) (2007) (stating that the Attorney General "may bring a civil action on behalf of the State" against manufacturer who fails to place funds in escrow) or N.C. Gen. Stat. § 66-293(a) (2007) (providing that Attorney General "may" impose civil penalty on person in violation of escrow requirements).

Simply put, no provision of the statute can be viewed as supplying a definition for "diligently enforced," as specifying the forum for determination of the issue of diligent enforcement, or as incorporating some unspecified standard of review for the exercise of prosecutorial discretion. In short, N.C. Gen. Stat. § 105-113.4C does not preclude an order compelling arbitration to determine whether North Carolina diligently enforced its escrow statute. The State has, therefore, failed to demonstrate that an order compelling arbitration is barred by sovereign immunity.

In a related argument, the State asserts: "Any judicial action which has the effect of usurping the prerogative of the General Assembly to determine the: (a) extent to which sovereign immunity is waived in a particular situation; or (b) limitations on the authority of any representative of the State to bind the State in contract on a particular subject, is barred by the Separation of Powers doctrine in Article I, section 6, Article II, sections 1 and 20, and Article IV, section 1, of the North Carolina Constitution." We do not understand the State to be contending in this argument that no authority existed to bind the State to the MSA—in oral argument, the State conceded that the General Assembly ratified the agreement, and the General

Assembly enacted the necessary legislation to implement its terms. To the extent that the State's argument hinges on N.C. Gen. Stat. § 105-113.4C, we have already concluded that the General Assembly did not intend, in passing that statute, to retroactively limit the procedures and standard for review governing the question of diligent enforcement. The Business Court's order compelling arbitration, therefore, does not violate the separation of powers doctrine.

II

[3] The State next contends that it did not, when signing the MSA, knowingly and intentionally agree to arbitrate whether North Carolina had "diligently enforced" its escrow statute. As the State asserts in its brief, " '[t]he [Federal Arbitration Act] directs courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so.' " (Quoting *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 293, 151 L. Ed. 2d 755, 768, 122 S. Ct. 754, 764 (2002)). Nevertheless, based upon our review of the MSA, we agree with all of the other jurisdictions considering this issue that the MSA subjects the issue of diligent enforcement to arbitration.

In order to determine whether a dispute is subject to arbitration, a court must "ascertain both (1) whether the parties had a valid agreement to arbitrate, and also (2) whether the specific dispute falls within the substantive scope of that agreement." *Raspet v. Buck*, 147 N.C. App. 133, 136, 554 S.E.2d 676, 678 (2001) (internal quotation marks omitted). In this case, there is no dispute that the MSA contains an arbitration agreement; the issue is whether a specific dispute—the question of diligent enforcement—falls within the scope of that agreement. A trial court's conclusion, as here, that a particular dispute is subject to arbitration is a conclusion of law, reviewable de novo by the appellate court. *Id.*

Although the State makes various arguments suggesting that we should construe the contract in the light most favorable to the State, "[t]he interpretation of the terms of an arbitration agreement are governed by contract principles." *Trafalgar House Constr., Inc. v. MSL Enters., Inc.*, 128 N.C. App. 252, 256, 494 S.E.2d 613, 616 (1998). *See also Brown v. Centex Homes*, 171 N.C. App. 741, 744, 615 S.E.2d 86, 88 (2005) ("The law of contracts governs the issue of whether an agreement to arbitrate exists."). As this Court has explained:

"Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the

court may not ignore or delete any of its provisions, nor insert words into it, but must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms." . . . "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract."

*Hemric v. Groce,* 169 N.C. App. 69, 76, 609 S.E.2d 276, 282 (quoting *Martin v. Martin,* 26 N.C. App. 506, 508, 216 S.E.2d 456, 457-58 (1975) and *Potter v. Hilemn, Inc.,* 150 N.C. App. 326, 331, 564 S.E.2d 259, 263 (2002)), *disc. review dismissed and cert. denied,* 359 N.C. 631, 616 S.E.2d 234 (2005). We, therefore, turn to the language of the MSA.

The State focuses on the provision of the MSA placing exclusive jurisdiction in the superior court. Section VII of the MSA provides:

(a) Jurisdiction. Each Participating Manufacturer and each Settling State acknowledge that the Court: (1) has jurisdiction over the subject matter of the action identified in Exhibit D in such Settling State and over each Participating Manufacturer; (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State; and (3) *except as provided in subsections IX(d), XI(c) and XVII(d) and Exhibit O,* shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to such Settling State. Provided, however, that notwithstanding the foregoing, the Escrow Court (as defined in the Escrow Agreement) shall have exclusive jurisdiction, as provided in section 15 of the Escrow Agreement, over any suit, action or proceeding seeking to interpret or enforce any provision of, or based on any right arising out of, the Escrow Agreement.

(Emphasis added.)

Subsection XI(c), a specific exception to the "exclusive jurisdiction" of the superior court, provides in turn:

Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral

arbitrators, each of whom shall be a former Article III federal judge. . . .

Thus, "[a]ny dispute, controversy or claim" falling within the scope of subsection XI(c) is not within the exclusive jurisdiction of the superior court and must be arbitrated.

The State contends, however, that the question of diligent enforcement does not fall within subsection XI(c). Other jurisdictions have unanimously held otherwise, and we agree with their analysis of the MSA.

With respect to the reference in XI(c) to "calculations performed by, or any determinations made by, the Independent Auditor," section XI(a)(1) of the MSA provides that the independent auditor "shall calculate and determine the amount of all payments owed pursuant to this Agreement, the adjustments, reductions and offsets thereto (and all resulting carry-forwards, if any), the allocation of such payments, adjustments, reductions, offsets and carry-forwards among the Participating Manufacturers and among the Settling States, and shall perform all other calculations in connection with the foregoing . . . ." Thus, the independent auditor has the responsibility to both calculate *and determine,* among other things, (1) the adjustments and (2) the allocation of adjustments among the settling states.

Subsection IX(j) sets out the steps that the independent auditor must take in calculating the PMs' annual payments. Each of 13 sequentially-numbered clauses references a particular adjustment, reduction, or offset that "shall be applied" to the results of the immediately preceding clause. The sixth step of that calculation states that "the NPM Adjustment *shall be applied* to the results of clause 'Fifth' pursuant to subsections IX(d)(1) and (d)(2) . . . ." (Emphasis added.) The subsection further provides that "[i]n the event that a particular adjustment, reduction or offset referred to in a clause below does not apply to the payment being calculated, the result of the clause in question shall be deemed to be equal to the result of the immediately preceding clause." Thus, as the Maryland Court of Special Appeals explained, "[t]his clause requires the independent auditor, as the party responsible for performing the calculation in question, to make a threshold determination whether the adjustment is applicable before computing its amount and modifying the amount of the subject payment by applying the adjustment." *State v. Philip Morris Inc.,* 179 Md. App. 140, 157, 944 A.2d 1167, 1177, *cert. denied,* 405 Md. 65, 949 A.2d 653 (2008).

STATE v. PHILIP MORRIS USA, INC.

[193 N.C. App. 1 (2008)]

The NPM adjustment cannot be divorced from the question whether a state diligently enforced its escrow statute. As the New Hampshire Supreme Court noted: "The parties do not point to, and the Court is not aware of, any provisions in the MSA other than those regarding the NPM Adjustment, where the diligent enforcement of a Qualifying Statute has any relevance. Thus, a dispute over diligent enforcement arises out of a determination by the Independent Auditor whether to apply the NPM Adjustment." *Philip Morris USA*, 927 A.2d at 512. *See also Philip Morris Inc.*, 179 Md. App. at 158, 944 A.2d at 1177 ("The diligent enforcement question, mentioned in the MSA only as part of the NPM Adjustment, is an indispensable underlying issue of the overall NPM Adjustment and, thus, the determination and calculations are inextricably linked."). Further, under XI(a)(1) of the MSA, the independent auditor is tasked with the allocation of payments and adjustments among the settling states. To make that allocation, there must be a determination whether the NPM adjustment applies; that determination in turn requires a determination whether the individual state has diligently enforced its escrow statute.

Accordingly, the issue of a state's diligent enforcement is a "dispute, controversy or claim arising out of or relating to . . . determinations made by, the Independent Auditor," as specified in subsection of XI(c) of the MSA. The issue is, therefore, subject to arbitration. This conclusion is confirmed by the subsequent parenthetical clause in the same subsection XI(c), specifying that arbitrable disputes "includ[e], without limitation, any dispute concerning *the operation or application* of any of the adjustments . . . described in subsection IX(j)." (Emphasis added.) The parties dispute whether the independent auditor properly refused to apply the NPM adjustment—thus, the dispute "concern[s] the . . . application" of the NPM adjustment. *See Philip Morris Inc.*, 179 Md. App. at 156, 944 A.2d at 1176-77 ("In the instant case, the auditor did not apply the NPM Adjustment to reduce the participating manufacturers' annual payment, a determination that resulted in a calculation greater than if the auditor had applied the NPM Adjustment. Accordingly, the question of diligent enforcement 'arises out of' or 'relates to' the auditor's calculations and determinations because it directly affects the amount of MSA payment the State and all other settling states receive. . . . As such, the dispute 'relates to' the 'operation' or 'application' of an 'adjustment' or 'allocation pursuant to IX(j).' ").

STATE v. PHILIP MORRIS USA, INC.

[193 N.C. App. 1 (2008)]

The State, however, contends that we should view XI(c)'s arbitration provision as referring only to accounting functions, such as the amount of payments. This argument overlooks the reference in the subsection to both "calculations" and "any determinations made by" the independent auditor. The plain language of the subsection thus broadens its scope beyond mere calculations. Indeed, calculation of the amount of payments. and allocation of the adjustments among the states necessarily requires a determination whether an escrow statute was diligently enforced. *See State v. Philip Morris, Inc.*, 279 Conn. 785, 799, 905 A.2d 42, 49 (2006) ("Accordingly, we conclude that the underlying dispute over the independent auditor's decision not to apply the adjustment falls within the scope of the arbitration provision because it directly involves a *determination* of the independent auditor. Moreover, this dispute also *arises out of or relates to* the independent auditor's *calculation* of the annual payments because its determination not to apply the nonparticipating manufacturer adjustment resulted in it *calculating* higher annual payments than if it had determined that the adjustment should apply.").

The State maintains further—without citation of any authority—that the issue whether a state diligently enforced its escrow statute is a "legal" determination that cannot be decided by an accounting firm. Yet, the State also admits that the question of diligent enforcement "is determined based on North Carolina's actions"—a factual issue. To construe subsection XI(c) as the State requests and limit its scope only to accounting calculations, excluding any other "determinations," would require rewriting the MSA—something we may not do. *See Philip Morris Inc.*, 448 Mass. at 847, 864 N.E.2d at 513-14 (rejecting argument that independent auditor lacked authority under MSA to make diligent enforcement determination because it is a " 'quintessential[ly] judicial determination' ").

The State also argues that the fact that the independent auditor refused to apply the NPM adjustment does not mean it made a determination on the issue of diligent enforcement. It is undisputed that the independent auditor based its refusal to apply the NPM adjustment on a "presumption" that the states were each diligently enforcing their escrow statutes. The arbitration clause, however, encompasses any dispute "*concerning* the operation or application of any of the adjustments" in subsection IX(j). (Emphasis added.) The decision of the independent auditor not to actually determine whether states diligently enforced their statutes is a dispute "concerning the operation or application" of the NPM adjustment by the independent audi-

STATE v. PHILIP MORRIS USA, INC.

[193 N.C. App. 1 (2008)]

tor. *See Philip Morris USA*, 927 A.2d at 510 (rejecting State's contention that because Auditor did not actually make specific determination regarding diligent enforcement, it was not arbitrable; court held that State "overlooks the broad language in the arbitration clause stating that *any* dispute, controversy or claim *arising out of or relating to* the Auditor's calculations or determinations is subject to arbitration").

In any event, as the Massachusetts Supreme Judicial Court reasoned, once the economic consultants determined that the MSA was a significant factor in the loss of market share, "the only means by which the auditor could have denied the NPM adjustment for that year was by affirmatively finding that there was diligent enforcement by the States. It is therefore logically necessary that the auditor did make a diligent enforcement determination. Whether the auditor made this determination explicitly, or impliedly, or by employing a presumption makes no difference." *Philip Morris Inc.*, 448 Mass. at 847, 864 N.E.2d at 513. *See also Philip Morris USA*, 927 A.2d at 510 ("We concur with other appellate courts that have held that the Independent Auditor did, in fact, make a determination regarding diligent enforcement of Qualifying Statutes.").

In short, the plain language of the MSA establishes that the issue of the application of the NPM adjustment for 2003, including the question of diligent enforcement, must be arbitrated. The State's arguments otherwise cannot be reconciled with the actual language of the MSA. *See, e.g., Philip Morris, Inc.*, 279 Conn. at 807-08, 905 A.2d at 54 ("Any challenge as to whether the independent auditor's initial determination [regarding applicability of the NPM adjustment] was, in fact, correct, under the circumstances, is an issue that the [MSA] reserves for binding arbitration."); *People v. Lorillard Tobacco Co.*, 372 Ill. App. 3d 190, 199, 865 N.E.2d 546, 554, *appeal denied*, 225 Ill. 2d 657, 875 N.E.2d 1119 (2007) (holding "that the plain and unambiguous language of the MSA's arbitration provision requires arbitration of the parties' dispute concerning the NPM Adjustment, including the State's diligent enforcement defense"); *Philip Morris Inc.*, 179 Md. App. at 162, 944 A.2d at 1180 ("The question of diligent enforcement cannot be made in a vacuum. We concur with the numerous jurisdictions that have held that the present dispute must be resolved under one clear set of rules that apply with equal force to every settling state."); *Philip Morris Inc.*, 448 Mass. at 849, 864 N.E.2d at 515 ("In sum, this dispute falls squarely under the arbitration provision of the [MSA]."); *State v. Philip Morris Inc.*, 8 N.Y.3d 574, 580, 869

N.E.2d 636, 639 (2007) ("The plain language of the MSA compels arbitration."); *State v. Philip Morris, Inc.*, 2007 ND 90, 732 N.W.2d 720, 727 (2007) ("Construing these provisions [subsections VII(a), IX(d), XI(c), and IX(j)] together, we believe the plain and unambiguous language of the settlement agreement requires arbitration of the parties' dispute.").

III

**[4]** Finally, the State contends that the PMs have released any claims they possess regarding a lack of diligent enforcement in 2003. The State points to 2003 Tobacco Settlement Agreements that were entered into separately from the MSA. The agreements provide that the signatory manufacturer "absolutely and unconditionally releases and forever discharges [each settling state] from any and all claims that it ever had, now has, or hereafter can, shall or may have . . . under Section IX(d) of the MSA with respect to Cigarettes shipped or sold during 1999, 2000, 2001, and 2002, including any effect such claims may have on future payments under the MSA."

The State then argues that "diligent enforcement" for 2003 relates to North Carolina's enforcement efforts during calendar year 2003. According to the State, any enforcement regarding escrow payments would have had to relate to cigarettes sold in 2002 and thus fall within the scope of the releases in the 2003 Tobacco Settlement Agreements. The PMs disagree with that construction of the MSA and the 2003 agreements, but argue that this question must be resolved by the arbitration panel. We agree.

It is well established that once a court has determined that a claim is subject to arbitration, then the merits of that claim—including any defenses—must be decided by the arbitrator. *See, e.g., Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 478 (9th Cir. 1991) ("[C]ourts must be careful not to overreach and decide the merits of an arbitrable claim. Our role is strictly limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator."), *cert. denied*, 503 U.S. 919, 117 L. Ed. 2d 516, 112 S. Ct. 1294 (1992); *Goshawk Dedicated v. Portsmouth Settlement Co. I*, 466 F. Supp. 2d 1293, 1311 (N.D. Ga. 2006) ("Courts may not consider defenses to the case generally, as opposed to specific challenges to an arbitration agreement, because these are properly reserved for arbitrators."); *British Ins. Co. of Cayman v. Water Street Ins. Co.*, 93 F. Supp. 2d 506, 521 (S.D.N.Y. 2000) (holding that once court has decided matter is arbi-

trable, court must refrain from deciding validity of any defenses and refer them for resolution by arbitration). This principle applies equally when the parties have entered into a contract containing an arbitration clause, a party seeks arbitration of a claim arising out of the contract, and the opposing party claims that a subsequent agreement—not containing an arbitration clause—released the claims sought to be arbitrated. *See Schlaifer v. Sedlow*, 51 N.Y.2d 181, 185, 412 N.E.2d 1294, 1296 (1980) ("Once the parties to a broad arbitration clause have made a valid choice of forum, as here, all questions with respect to the validity and effect of subsequent documents purporting to work a modification or termination of the substantive provisions of their original agreement are to be resolved by the arbitrator.").

In this case, the State's contention regarding the 2003 agreements addresses the merits of the PMs' claim under the MSA that they are entitled to have their required 2003 payments lowered based on the NPM adjustment. The State's assertion that the PMs' claim for a reduction is barred by the 2003 Tobacco Settlement Agreements constitutes a defense to the claim. The issue must, therefore, be decided by the arbitration panel. *See Philip Morris USA*, 927 A.2d at 512-13 ("[T]he dispute over whether the June 2003 agreements prohibit the PMs from contesting diligent enforcement in 2003 falls within the purview of the Independent Auditor's determination concerning applicability of the NPM Adjustment to the PMs' 2003 annual payment, and therefore must be presented as part of the arbitration process."); *Philip Morris Inc.*, 179 Md. App. at 167, 944 A.2d at 1183 ("Concurring with the other jurisdictions, we agree with the original manufacturers' assertion. . . . The dispute over whether the June 2003 Agreements prohibit the original manufacturers from contesting diligent enforcement in 2003 falls within the purview of the auditor's determination concerning the applicability of the NPM Adjustment and, therefore, must be presented as part of the arbitration process."). The Business Court's order compelling arbitration is, therefore, affirmed.

Affirmed.

Chief Judge MARTIN and Judge STEELMAN concur.